GRIFFIS, P.J.,
for the Court:
¶ 1. Stone Investment Company, Inc. brought an action against the Estate of Arlan Robinson and William Head d/b/a William Head Realty to recover the earnest-money deposit and other damages that resulted from the breach of a real-estate contract. The Estate and Head responded with their claims to the earnest-money deposit. The chancellor ruled that Stone Investment had breached the contract and forfeited the earnest-money deposit. The chancellor awarded the earnest money deposit to the Estate and Head. We find no error and affirm.
FACTS
¶ 2. Arlan Robinson was the owner of approximately twenty acres of land located at the corner of Highways 26 and 49 in Stone County, Mississippi.
¶ 3. In 2001, Arlan executed his Last Will and Testament. The will named his wife, Martha Robinson, as executrix. Paragraph VI of the will reads:
I do hereby direct my Executrix, at the discretion of my attorney, Honorable Herbert J. Stelly, Sr., to select an auctioneer who, in the opinion and discretion of Honorable Herbert J. Stelly, Sr., shall be best suited for purposes of selling the 20 somewhat acres of Property situated at the corner of Highway 26 and 49 in Stone County, Mississippi next to McDonald’s. I desire that said property be auctioned off and that every effort be made to obtain the highest and best dollar for said property. Honorable Herbert J. Stelly, Sr., is given discretion and is to guide and advise my Executrix with regard to the selection of such auctioneer and the conditions and provisions in which such auction is to be held as well as the fee to be realized by such auctioneer for such services. Out of the proceeds of such auction I direct that any sums realized from the sale of such property be used to retire any obli *633 gations which may exist against the Denson property, then such funds shall be applied toward payment of the mortgage on the home situation at 35 Walton Road •with any monies left owed, if any, to be placed in an interest bearing account for the benefit of my son, Dalton; to be received by him at 21 years of age.
¶ 4. Arlan died on June 6, 2005.
¶ 5. On August 25, 2005, Herbert J. Stelly Sr. executed a Complaint Requesting Probate of Will and Appointment of Executrix on behalf of Martha. The complaint asked the chancery court to probate the decedent’s will and to appoint Martha as executrix, “upon taking the oath of office as by law required.” It also asked that her appointment as executrix be without the necessity of bond.
¶ 6. On October 5, 2005, Chancellor Margaret Alfonso executed an Order Allowing Will to Probate. The order admitted the will to probate, appointed Martha as executrix, and waived appraisal and bond. The order also held that “the Clerk of this Court is directed to issue letters of administration to the Executrix, Martha Robinson, upon her taking the oath of office as by law required.”
¶ 7. By letter dated October 11, 2005, Stelly sent both the complaint and the executed order to the Stone County Chancery Clerk. These pleadings were filed by the clerk on October 12, 2005.
¶ 8. On October 11, 2005, Tadd Parsons, an attorney for Stone Investment, sent a letter to Stelly. The letter read as follows:
Bennie Bell at the First National Bank of Wiggins told us you represent the Estate of Arlan Robinson. He also told us that Mrs. Robinson was interested in disposing of the property on Highway 49 and Highway 26, the property being located at Hunters Walk and another parcel. Stone Investment Company, Inc. may be interested in purchasing this property!;] and if your client has a survey of the property, if you would fax them or mail them to us, I will ask them to look at it and let you know whether or not they are interested.
On October 24, 2005, Stelly responded and sent a copy of the survey to Jack Parsons.
¶ 9. On January 17, 2006, Martha signed an Auction Listing Agreement with William Head Realty. This agreement was to facilitate the auction and sale of the property, consistent with the terms of the will. This agreement provided that William Head Realty, as auctioneer, was entitled to receive a ten percent commission from the sale. The agreement also provided that an auction would be held on or about March 14, 2006.
¶ 10. To prepare for the auction, William Head Realty prepared and distributed a “Buyer’s Guide.” The buyer’s guide was issued to all prospective bidders, including Stone Investment. The buyer’s guide included a “Terms of Sale” provision, which provided that a ten percent nonrefundable deposit, based on the contract price, was to be paid by the prospective purchaser after being awarded the bid. The buyer’s guide also included surveys that divided the property into smaller parcels. The survey of the parcel, which is the subject of this dispute (Parcel 1), indicated a sewer easement.
¶ 11. The auction was held on March 14, 2006. Stone Investment offered the highest bid on Parcel 1, in the amount of $312,400. Stone Investment tendered a check, dated March 14, 2006, in the amount of $31,240, to William Head Realty for the required earnest-money deposit for the purchase of Parcel 1. The auctiori also included other parcels.
¶ 12. After the auction, Stone Investment executed a Purchase Contract. The *634 purchase contract was not dated. The purchase contract identified “Martha Robinson” as the Seller and “Stone Investments” as the Purchaser, and it contained the following provisions:
1. THE PURCHASER OFFERS TO BUY THE PROPERTY located in Stone County, Mississippi, commonly known as Wiggins, MS Parcel # 1 and legally described as: See Attached Legal Description(s) subject to any of the following existing matters: ... easements of record ..., if any, for the sum of $312,400....
3. PURCHASER HAS EXAMINED THIS PROPERTY and accepts it in its present “AS IS” condition, and with all faults. Purchaser accepts all faults of the property whether known or unknown, presently existing or that may hereafter arise.... Purchaser in examining and inspecting this property has not relied upon any representations made by the Seller, but is relying solely on his own personal examination and inspection of the property....
6. WARRANTY DEED AND CERTIFICATE OF TITLE shall promptly be furnished by the party responsible for the cost [Purchaser to pay all costs] and shall be prepared by a mutually agreed upon attorney, a certificate of title insurance may be obtained from a title insurance company.... Seller shall cure any title defects to the satisfaction of the title insurance company that the Purchaser may obtain an owner’s title insurance policy subject only to standard exceptions and other matters specifically stated in this contract....
9. CLOSING DATE shall be April 13, 2006, but may be sooner by mutual consent, CLOSING DATE MAY BE EXTENDED up to thirty (30) days if[:] (A) Mutually Agreed to, or (B) title defects are reported which may be cured,....
11. PURCHASER UPON EXECUTION OF THIS AGREEMENT DEPOSITS $31,240, to be held by Agency [ (William Head Realty) ] in a non-interest bearing account, which deposit constitutes a good faith deposit to be applied on the Purchase Price. If this is not accepted, or the title is not insurable as stated above, then the deposit shall be refunded, otherwise the deposit shall be retained by the Agency. Seller may seek damages for breach of contract or specific performance of the contract. If Purchaser does not close by the terms listed in this contract the deposit will be forfeited to the Agency.
¶ 13. On April 11, 2006, Jack Parsons, as the attorney for Stone Investment, sent two letters to William Head Realty. One letter read:
This is your official notification that Stone Investment Company, Inc. has authorized me to notify you that they are electing to purchase the parcel of property that they were high bidder on when you conceded the sale of the Arlan L. Robinson Estate property. You will note in my letter to our client, Wes Parker, the same conditions have to be fulfilled before Stone Investment Company, Inc. will pay for said property. However Stone Investment Company, Inc. informed me they have the money available to purchase the property upon presentation of the Deed conveying good *635 and merchantable title to the purchaser....
¶ 14. The other letter read:
We have been requested to examine the title to the property to be purchased by Wesley Parker. We have done so and have found several matters that will have to be corrected at the closing or before closing. They are as follows, to-wit:
1. Cancellation of all Deeds of Trust on the property. There are several and I presume the funds gotten from the sale will be used to pay those and there be sufficient amount to do so.
2. An adjudication there are no outstanding claims by any creditors against the Estate which would then follow them to the particular parcel of real property.
3. A closure of the estate adjudicating no other liens or claims on the property other than the Deeds of Trust.
I have been informed by Wes Parker that he desires to close this transaction upon being able to secure good merchantable title to the property. This is your official notification that he is electing to purchase the property and is waiting until title insurance can be secured on the property. If you or your proper representative will let us know when this can be done then Mr. Parker will go ahead and close out the sale....
¶ 15. The April 11th letters were dated two days prior to the April 13th closing date set in the purchase contract. The letters neither indicated that time was of the essence nor set a new closing date.
¶ 16. On April 20, 2006, Martha filed a Motion for Authority to Sell Real Estate. The motion attached several contracts for the sale of Arlan’s property, including the purchase contract for Parcel # 1. The motion asked for authority to sell the property and to place the proceeds into an escrow account until the time for filing claims expired. The motion also asked the chancellor to waive bond.
¶ 17. On May 9, 2006, a proof of publication was filed. The proof indicated that the notice to creditors was executed by Martha on January 26, 2006, and it was published in the appropriate newspaper on March 18, March 25, and April 1, 2006.
¶ 18. On May 24, 2006, Chancellor Alfonso entered an Order Authorizing Sale of Real Property. The order ruled that “the Executrix of the Decedent’s estate has complied with said will and several contracts have been entered into at a price deemed by the Executrix as well as by the Court as being fair and reasonable to all parties concerned.” The order identified the sale price of all of the parcels, the amounts owed on the property, and concluded that the amounts owed must be paid at the time of sale. The order authorized the sale and provided that the balance, sales price less mortgages paid, be placed in Stelly’s trust account until further order of the court.
¶ 19. A closing date was scheduled for July 28, 2006. William Petty, the closing attorney, prepared a deed, the HUD-1 Settlement Statement, and releases from various deeds of trust to- be used in the closing. The deed was to be signed by Martha, individually and as executrix of the Estate. All parties attended the closing at Parsons’s office on July 28. At the closing, Stone Investment refused to close the transaction.
¶ 20. The record contains conflicting evidence of the basis for Stone Investment’s refusal to close. Initially, Stone Investment indicated that its refusal was based on deficiencies in the parcel’s title due to the sewer easement. However, Dana Par *636 sons, the president of Stone Investment, later testified that the reason for Stone Investment’s refusal to close on the subject property had nothing to do with the existence of the sewer easement. Rather, Stone Investment had purportedly promised Fred’s Discount Stores, a prospective purchaser of the property, that the parcel would be in place by April 13, 2006. Apparently, however, Fred’s was no longer interested in purchasing the property from Stone Investment in late July. At trial, Stone Investment offered the testimony of two attorneys, as experts in estate and real-estate conveyances, to prove that the title to the property was not merchantable.
¶ 21. On August 15, 2006, Stelly sent a letter to Jack Parsons that read, “Please advise me within 7 days as to whether or not Stone Investment Company, Inc. intends to go forward with the purchase of the Robinson Estate properties.”
¶ 22. On August 23, 2006, Jack Parsons sent a letter to Stelly that read:
I am in receipt of your letter dated August 15, 2006[,] about the above-mentioned matter. Stone Investment Company, Inc. is not interested in consummating the purchase of the Robinson property because there is a sewer line going across it., as it is presently located. Stone Investment Company, Inc. would consider buying both parcels if it would be commensurate with the value of the sewer lines thereon. If your client wants to talk about that, we will be happy to do so otherwise we request the deposit be returned.
¶ 23. On September 26, 2006, Jack Parsons again "wrote a letter to Stelly. Jack Parsons stated that Stone Investment offered to purchase the subject property for sixty-five percent of the initial bid price put forth by Stone Investment. If this was not acceptable, Stone Investment asked for the return of the earnest-money deposit. This letter also stated, “several months have now passed by without tendering the Deed after Stone Investment Company, Inc. elected to purchase. This was a breach of the contract provisions and in addition to that, the instruments tendered were not proper nor was the HUD 1 tendered proper.” The offer was rejected.
¶ 24. On December 18, 2006, Stelly sent a letter to the chancery clerk, which read: “Enclosed, please find for issuance and filing ... Letters Testamentary.” On December 19, 2006, the chancery clerk executed and issued the letters testamentary to Martha as the executrix of the Estate.
¶ 25. On May 25, 2007, Stone Investment filed its complaint against the Estate and Head. The complaint claimed that the Estate and Head had breached the purchase contract and that the Estate was without authority to enter into the purchase contract. The complaint asked the court to order the return of the earnest-money deposit and to enter a judgment for interest, costs, attorney’s fees, and punitive damages.
¶ 26. Head filed an answer, defenses, counterclaim, and cross-claim. In the counterclaim, Head asked the chancery court to award him the full amount of the earnest money and any other damages he was entitled to receive. In the cross-claim, Head asked the chancery court to award him the commission earned on the sale, attorney’s fees, and any other damages he was entitled to receive. The Estate filed an answer, defenses, and counterclaim. The counterclaim sought to retain the earnest money deposit.
¶ 27. On April 8, 2008, the executrix signed and filed her oath. The case was tried before the Honorable James H.C. Thomas on September 1, 2009. On De *637 cember 4, 2009, the chancellor entered a judgment that contained his findings of fact and conclusions of law. Chancellor Thomas dismissed Stone Investment’s complaint, granted the counterclaims of Head and the Estate that sought forfeiture of the earnest-money deposit, denied the requests for attorney’s fees because there was no contractual provision for attorney’s fees, and dismissed all other claims asserted.
STANDARD OF REVIEW
¶ 28. Under our standard of review, “[the appellate court] will not disturb the findings of the chancellor when supported by substantial evidence unless the chancellor has abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.” Sanderson v. Sanderson, 824 So.2d 628, 625-26 (¶8) (Miss.2002). However, questions concerning the construction of a contract are questions of law and are reviewed de novo. Ferrara v. Walters, 919 So.2d 876, 881 (¶ 9) (Miss.2005).
ANALYSIS
¶ 29. Stone Investment identified two issues for this Court to consider:
1. The chancery court erred in failing to return the earnest money tendered by Stone Investment Company, Inc.
2. The chancery court erred in finding that Stone Investment Company, Inc. breached the contract when the Estate of Arlan Robinson failed to provide good and merchantable title to obtain the subject property.
In both of these issues, Stone Investment challenges the chancellor’s judgment on the ground that the Estate was not able to convey good and merchantable title to the subject property. Therefore, Stone Investment claims that the Estate was in breach of the purchase contract, and it was error for the chancellor not to order the return of the earnest-money deposit. We first review the alleged deficiencies in the administration of the Estate and next consider the claim that merchantable title could not be delivered.

I. Administrative Deficiencies

¶ 30. This Court first considers whether the Estate was properly administered. The issue here is whether the executrix had the authority to execute the purchase contract or the deed of conveyance. Stone Investment argues that it was not; therefore, she did not.
¶ 31. Stone Investment cites four statutes. First, Mississippi Code Annotated section 91-7-41 (Rev.2004) provides:
Every executor ... at or prior to the time of obtaining letters testamentary ... shall take and subscribe the following oath, viz.:
“I do swear that the writing exhibited by me is the true last will and testament of_, as far as I know and believe, and that I, if and when appointed as executor, will well and truly execute the same according to its tenor, and discharge the duties required by law.” In the case of an administrator with the will annexed, then say “I, as administrator, will,” and “when appointed as administrator, will” etc.
Stone Investment argues that the executrix failed to file an oath, and the letters testamentary did not legally issue. Therefore, Stone Investment contends that Martha was “without authority to act as an Executrix.”
¶ 32. Second, Mississippi Code Annotated section 91-7-197 (Rev.2004) provides:
*638 When- a petition shall be filed to sell or lease land to pay debts or otherwise affecting the real estate of a deceased person, all parties interested shall be cited by summons or publication, which shall specify the time and place of hearing the petition. If the petition be filed by a creditor or by a purchaser to correct a mistake in the description of the land, the executor or administrator shall be cited.
Stone Investment argues that the executrix failed to serve all parties in interest by summons or publication to sell the property. Therefore, Stone Investment contends that it “could not secure good and merchantable title” to the property.
¶ 33. Third, Mississippi Code Annotated section 91-7-187 (Rev.2004) provides:
When the estate of any deceased person consists of real and personal property and it shall be necessary to sell a portion thereof, the chancery court, on petition of the executor, administrator, legatees or distributees, being satisfied that it would be to the interest of the distribu-tees or legatees, may decree a sale of the real estate in preference to the personal estate. .
Here, Stone Investment argues that the executrix failed to “get the court to adjudicate the selling of real estate in preference to selling personal property to pay debts of the estate.” Stone Investment contends that “[flailing’to do this prevents the Executrix [from] having authority to legally sell the real property.”
¶ 34. Fourth, Mississippi Code Annotated section 91-7-199 (Rev.2004) provides:
The court, after service of summons or proof of publication, shall hear and examine the allegations and evidence in support of the petition and the objections to and evidence against it, if any. If on such hearing the court be satisfied that the personal estate is insufficient to pay the debts of the deceased and that the land ought to be sold for that purpose, it may make a decree for the sale of a part or the whole of the land; and when a part only is decreed to be sold, the decree shall specify what part. If the real estate be so situated that a part cannot be sold without manifest prejudice to the heirs or devisees, the court may decree that the whole shall be sold; and the overplus arising from such sale, after the payment of debts and expenses, shall be distributed amongst the heirs according to the law of descents, or amongst the devisees according to the will. The heir or devisee whose lands shall be sold may compel all others holding or claiming under such intestate or testator to contribute in proportion to their respective interests, so as to equalize the burden of the loss.
Stone Investment argues that a hearing was not held, and the chancellor did not hear evidence to satisfy the need to sell the property to pay debts.
¶ 35. Stone Investment challenges the administrative authority -of the executrix. Since Martha failed to follow the statutory requirements, Stone Investment argues that this prevented the legal and binding sale and conveyance of good and merchantable title.
¶ 36. The chancellor’s judgment recognized that deficiencies in the administration of the estate existed. The chancellor, however, determined these deficiencies could have been cured; thus, he ruled that Stone Investment had breached the contract. The .chancellor found:
While the administrative concerns of the procedure followed in the probate of the Estate in not timely obtaining and filing the letters testamentary and oath are troubling to the Court as they relate to whether it makes defective any subse *639 quent action of the Executrix, the 1924 case of Ricks v. Johnson, 99 So. 142, 134 Miss. 676 (1924) makes a distinction between the duties of an executor and an administrator in probate administration which gives further credence to the action of the executor, in stating[:]
“An executor is the person to whom the execution of a last will and testament is, by the testator, confided. He is placed in the stead of the testator. He may enter to the goods and chattels of the testator; he may dispose of them in the payment of the debts, and in the performance of the testator’s will, and may sue for and recover the debts due to him. The executor derives his office from the testamentary appointment alone, and his authority is grounded on the will. And hence he may perform many acts in his character of executor before probate of the will.” Citing Grant v. Spann, 34 Miss. 294.
Thus the Court finds any deficiencies which existed in the probate administration at the time the contract with Stone [Investment] was made or executed could be cured to transfer a good and merchantable title to the real property and that the Executor was carrying out the explicit directions of the will in the manner in which the property was marketed for sale as approved by the Court. Stone defaulted on the contract before merchantable title could be transferred.
¶ 37. The deficiencies that the chancellor refers to relate to the delay in the issuance of letters testamentary. The Estate was opened by the chancellor’s October 5, 2005 order. The chancellor’s order admitted the will to probate and appointed Martha as executrix. The order also held that “the Clerk of this Court is directed to issue letters of administration to the Executrix, Martha Robinson, upon her taking the oath of office as by law required.” However, the oath was not taken (signed) until April 8, 2008, yet the letters testamentary were issued on December 19, 2006. Both of these actions occurred after the purchase contract had been signed and the closing date had passed.
¶ 38. When we consider the statutes cited by Stone Investment, we too are troubled by the executrix’s failure to follow the statutory procedure. Certainly, it is expected of all executors that they take, sign, and file the oath as soon as possible and that they have the letters testamentary issued prior to the time they take action on behalf of the estate. However, we note that the statutory procedure does not include an absolute remedy or legal consequence for the failure to comply with the requirement. Indeed, neither the cases cited by Stone Investment nor the research of this Court have found any case law that would void the transaction.
¶ 39. To support this argument, Stone Investment cites only the Estate of Manscoe v. Simmons, 512 So.2d 682 (Miss.1987). In Simmons, the chancery court approved a probated claim of a real-estate agent, Honey Simmons. Id. at 683. Manscoe[1] died intestate and had no surviving spouse. After Manscoe’s death, Jimmy Coleman, a relative of Manscoe’s wife, qualified as Manscoe’s administrator, believing himself to be the proper heir, and contracted with Simmons to sell the decedent’s real estate. Id. Shortly thereafter, William Champ Goodman, Manscoe’s son, was substituted as the administrator. Simmons continued her effort to sell the property and obtained a contract. But the potential buyers dealt with the estate and bought the property from Goodman directly. Goodman did not sign the contract *640 secured by Simmons. Id. Simmons probated a claim against the estate for her commission. Id. at 464. The supreme court recognized that “[o]rdinarily the administrator does not sell real estate belonging to the decedent,” and cited Mississippi Code Annotated sections 91-7-187 and 91-7-191 as proper statutory authority to sell property. Id. at 684.
¶40. There are two exceptions to the general rule that an executor cannot sell realty as he or she can sell personalty for the payment of debts of the estate: (1) where there is a testamentary power of sale and (2) a sale under court order. Robert E. Williford, Miss. Probate and Estate Administration § 12:1 (3d ed. 2003). Here, the executrix was authorized to proceed with the sale of the subject property under both of these exceptions.
¶ 41. In his will, Arlan expressly directed Martha, as his executrix, to sell this property. The will directed the manner in which the sale was to proceed, by way of auction. Because Arlan had provided Martha with this express testamentary power of sale, the extent of her authority is governed by the language of the will itself; it is not derived from a statute. Kyle v. Wood, 227 Miss. 717, 723, 86 So.2d 881, 883 (1956).
¶ 42. The testamentary power of sale removed the sale at issue from the statutory scheme that Stone Investment urges this Court to apply. Indeed, the statutes only apply in the absence of such authority to sell. Here, Martha carried out the explicit directions of the will in the precise manner it directed. Therefore, Martha, pursuant to the express testamentary power of sale, possessed the legal authority to sell the subject property consistent with the will’s direction.
¶ 43. When an executrix possesses power under the will to sell the land, the sale of such land is not considered a “judicial sale.” Davis v. Sturdivant, 197 Miss. 139, 19 So.2d 499, 500 (1944). Therefore, when a valid testamentary power of sale exists, there is no need to obtain a court order justifying the sale. Id.
¶ 44. Stone Investment’s contention that Martha was required to post bond in order to sell the subject property is also misplaced. The failure of bond does not affect the validity of the sale; rather, the purpose of the bond requirement is to ensure proper application of the funds.
¶ 45. Further, the chancellor apparently cured any potential administrative defects when the chancellor authorized the sale, by order dated May 24, 2006. The Estate asked for a waiver of the bond in its petition for sale, and, indeed, the chancellor acquiesced to the waiver when the executed order authorizing the sale did not require a bond. In lieu of bond, the chancellor’s order instructed that any proceeds realized from the sale were to be applied first to the disposal of any outstanding purchase-money liens on the property.
¶ 46. We also find it instructive to consider when the executrix derived her testamentary appointment. We have found several cases that indicate it is derived upon appointment and none that hold it is derived upon the issuance of the letters testamentary.
¶ 47. Recently, the Mississippi Supreme Court decided Clark Sand Co., Inc. v. Kelly, 60 So.3d 149 (Miss.2011). In Clark Sand, the plaintiff, Ruby C. Kelly a/k/a Ruby Kelley, brought a wrongful-death action as the personal representative of David Bozeman. Id. at 152 (¶¶ 2-3). Bozeman filed a mass-tort personal-injury lawsuit that alleged he had contracted lung cancer due to his exposure to silica. Boze-man died after the action commenced, and Kelley did not amend the complaint or move to be substituted as the real party in *641 interest. The complaint was then dismissed. Id. at 153 (¶¶ 4-5). Kelley then filed a complaint as the executrix of the Estate of Bozeman. Clark Sand answered the complaint and brought a summary-judgment motion that argued the case should be dismissed because Kelley had “no standing to bring the suit because she had not yet been formally appointed executrix of Bozeman’s estate and she was not Bozeman’s wife.” Id. at (¶ 7). The circuit court denied the motion, and an interlocutory appeal was brought by Clark Sand. Id. at 154 (¶ 10).
¶ 48. The supreme court considered whether Kelley had standing as Bozeman’s personal representative. The supreme court ruled:
The first potential wrongful-death claimant is “the personal representative of the deceased person.” Miss. Code Ann. § 11-7-13 (Rev.2004). “Personal representative” is defined as “[a] person who manages the legal affairs of another because of incapacity or death” and when it is used by a testator, the term refers to an executor or administrator of the estate. Black’s Law Dictionary 1045 (abr. 7th ed. 2000). See also Hill v. James, 252 Miss, at 507-508, 175 So.2d at 179 (finding terms “personal representative” and “legal representative” to be synonymous, defined simply as “executors and administrators of persons deceased”).
To have standing as a personal representative to bring a wrongful-death action, the plaintiff must be formally appointed as such prior to filing the complaint for wrongful death.... If the potential claimant has not been formally appointed administrator or executor of the decedent’s estate at the time he or she commences the wrongful-death action, it follows that the person is without standing as a personal representative to bring the suit. See also [Delta Health Group, Inc. v. Estate of] Pope [ex rel. Pope], 995 So.2d [123,] 126 [(¶ 13) (Miss.2008)] (holding that decedent’s great-nephew did not cure lack of standing by subsequently being appointed administrator of decedent’s estate).
It is undisputed that, at the time she filed the suit, Kelley had not yet been formally appointed executrix of Boze-man’s estate, as the Alabama probate court had not yet issued her letters testamentary. So Kelley could not have had standing as Bozeman’s personal representative to bring this action at that time. Long [v. McKinney], 897 So.2d [160,] 174 [(¶ 57) (Miss.2004)].
Her being named executrix in Boze-man’s will does not change this. Until it was probated, Bozeman’s will conferred no legal authority upon Kelley.... An unprobated will “is nothing more than a piece of paper with writing on it,” and it “cannot be relied on to determine the ownership of property because it is not effective as an instrument of title.... ”
... Kelley thus had no authority to bring a wrongful-death claim on behalf of the estate until she was formally appointed executrix thereof. ... Since “standing is to be determined as of the commencement of suit,” and Kelley was not appointed executrix until after she had commenced this action, Kelley could not have had standing as a personal representative to commence this wrongful-death action when she did....
Kelly, 60 So.3d at 155-56 (¶¶ 16-19) (emphasis added). This case is instructive because the supreme court repeatedly stated that the personal representative’s authority comes from the appointment as executrix, not from the issuance of letters testamentary or letters of administration. We find this distinction important here. *642 Stone Investment has cited no other cases to the contrary.
¶ 49. We also must consider the chancellor’s conclusion that the administrative deficiencies could have been cured in advance of the closing. In the purchase contract, Stone Investment was charged with obtaining a certificate of title. Of particular note, Jack Parsons’s letter dated April 11, 2006, to William Head Realty stated: Stone Investment’s intent to go forward with the transaction, that Stone Investment had examined the title to the property and “found several matters that will have to be corrected at the closing or before closing.” The three matters itemized did NOT include the deficiencies relied upon now. Thus, it was within the chancellor’s determination to conclude that Stone Investment had breached the contract due to the existence of the sewer easement and not because of any administrative deficiencies with the Estate. Thus, we find no error in the chancellor’s determination that the administrative issues of the Estate could not be cured to transfer good and merchantable title. Therefore, this Court does not find that the chancellor’s judgment was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Accordingly, as to this issue, the chancellor’s judgment is affirmed.

II. Good and Merchantable Title Tendered in a Timely Manner

¶ 50. In its second issue, Stone Investment argues that the Estate failed to tender good and merchantable title and a proper deed within the prescribed deadline for closing set forth in the purchase agreement. Stone Investment also argues that the deed tendered was improper because it was subject to encumbrances on the property.
¶ 51. We first consider the timeliness argument. The purchase contract included a provision that set the closing date:
9. CLOSING DATE shall be April 13, 2006, but may be sooner by mutual consent, CLOSING DATE MAY BE EXTENDED up to thirty (30) days if[:] (A) Mutually Agreed to, or (B) title defects are reported which may be cured,....
Stone Investment argues that the purchase contract expired by its own terms on April 13, 2006, when no deed had been tendered.
¶ 52. The chancellor determined this allegation had no merit. The chancellor found that the April 11, 2006 letter from Stone Investment’s attorney indicated its intent to go forward with the transaction and placed no date or time restriction on the conveyance. The Estate did what was requested when it obtained, on May 24, 2006, the chancellor’s order that approved the sale of the property. The evidence also indicated that the parties mutually agreed on a closing date scheduled approximately sixty days later, for July 28, 2006. There was no evidence that, during this time, Stone Investment refused to close based on the fact that the contractual closing date had passed. Instead, Stone Investment’s representatives attended the scheduled closing on July 28. It was during the closing on July 28th that Stone Investment refused to close the transaction.
¶ 53. Therefore, we find no error in the chancellor’s decision to reject Stone Investment’s claim that the purchase contract expired by its own terms on April 13, 2006.
¶ 54. Next, we consider Stone Investment’s claim that the Estate failed to tender good and merchantable title and the claim that the deed tendered was im *643 proper because it was subject to encumbrances on the property.
¶ 55. There was conflicting evidence of Stone Investment’s refusal to close. Initially, Stone Investment indicated that its refusal was based on deficiencies in the parcel’s title due to the sewer easement. However, Dana Parsons, the president of Stone Investment, later testified that the reason for Stone Investment’s refusal to close on the subject property had nothing to do with the existence of the sewer easement. Rather, Stone Investment had purportedly promised Fred’s, a prospective purchaser of the property, that the parcel would be in place by April 13, 2006. Apparently, however, Fred’s was no longer interested in purchasing the property from Stone Investment in late July 2006. At trial, Stone Investment offered the testimony of two attorneys, as experts in estate and real-estate conveyances, to prove that the title to the property was not merchantable.
¶ 56. The chancellor considered the testimony of the competing four expert witnesses and found that the closing would have cured “any deficiencies by the payment of liens and other title considerations.” The chancellor also rejected the claim that the sewer easement affected the merchantability of title. The chancellor concluded that the “presence of the sewer easement was a known public exception to which Stone [Investment] could not object.” The chancellor found that Stone Investment’s “unilateral effort to defeat the contract on the basis of the sewer easement would be a breach of the contract.” In addition, the chancellor found the reduced offers to purchase the property, letters dated August 3, 2006, and September 26, 2006, contradicted its claim that merchantable title could not be conveyed. Thus, the chancellor found the purchase contract was a binding contract and that merchantable title could be conveyed, with the deficiencies cured at closing.
¶ 57. We again note that the purchase contract required Stone Investment to pay for all closing costs. Paragraph 6 of the purchase contract provides:
WARRANTY DEED AND CERTIFICATE OF TITLE shall promptly be furnished by the party responsible for the cost and shall be prepared by a mutually agreed upon attorney, a certifí-cate of title insurance may be obtained from a title insurance company.... Seller shall cure any title defects to the satisfaction of the title insurance company that the Purchaser may obtain an owner’s title insurance policy subject only to standard exceptions and other matters specifically stated in this contract. ...
Under the purchase contract, Stone Investment was responsible for obtaining a certificate of title. The contract required Stone Investment to examine the title to identify any “title defects.” Then, the contract permitted the Estate, as the seller, an opportunity to cure any such “title defects” to the satisfaction of the title-insurance company. That never happened. Instead, the chancellor determined that Stone Investment had breached the purchase contract when it refused to close the transaction on July 28, 2006, or allow the Estate an opportunity to cure any title defects. We find that the chancellor’s findings of fact are supported by the evidence, and the chancellor’s judgment was not manifestly wrong, clearly erroneous, and did not apply an erroneous legal standard. Accordingly, the chancellor’s judgment is affirmed.
¶ 58. THE JUDGMENT OF THE CHANCERY COURT OF STONE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
*644 LEE, C.J., MYERS, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR. IRVING, P.J., AND BARNES, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. ISHEE, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. Manscoe’s first name is not supplied in the case.